Michael W. BARGER, Appellant,

v.

CHARLES MACHINE WORKS, INC., a Corporation, Appellee.

No. 80–1868.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1981.

Decided Sept. 3, 1981.

---

Frank Matthews (argued), Matthews & Cannon, P. C., Omaha, Neb., Raymond E. Pogge, Pogge, Root & Steege, Council Bluffs, Iowa, for appellant.

Emmet Tinley (argued), William R. Hughes, Jr., Stuart, Tinley, Peters, Thorn, Smits & Sens, Council Bluffs, Iowa, for appellee.

Before HEANEY and HENLEY, Circuit Judges, and NICHOL,* Senior District Judge.

HENLEY, Circuit Judge.

Michael W. Barger appeals from an adverse judgment of the district court, entered upon a jury verdict in favor of Charles Machine Works, Inc., in a products liability action brought by Barger to recover damages for a leg injury sustained while he was using a combination trenching, backhoe, and cable plow machine[1] (a Ditch

---

* The Honorable Fred J. Nichol, Senior District Judge, District of South Dakota, sitting by designation.

1. The machine consists of an earth-trenching boom and a cable plow mounted at the rear and a backhoe and backfill blade attached to the front. The operator sits just aft of the center of the unit when operating the trencher or cable plow. To operate the backhoe, he must move to a special seat at the front of the machine. Two vertical levers that operate the backhoe are located in front of this seat on top of the unit and are out of the operator's reach when he is sitting in the main seat using the trencher or cable plow. Activation of the machine's hydraulic system activates all the levers of the machine, and they remain activated while the machine is in operation. Although the backhoe levers cannot be locked into position while the trencher/cable plow is being used, the backhoe may be placed in the stowed

Witch) that was designed and manufactured by appellee. We reverse the judgment and remand the case for a new trial.

On July 2, 1976 Barger, a construction foreman with Northwestern Bell Telephone Company, was supervising a crew of four men who were using appellee's machine to plow telephone cable into ground located along a row of lilac bushes and pine trees with dense branches that overhung the property on which the crew was working. Although only the cable laying equipment on the machine was necessary to complete the work, appellant, who was experienced in working with heavy machinery, directed his crew to unchain and lower the stowed backhoe boom and the outriggers to a height of about eighteen inches above the ground because the boom was too high to allow the machine to proceed through the overhanging branches. In order to prevent the backhoe from being raised or lowered or from swinging to the side, he then instructed Randy Hutchinson, one of his crewmen, to stand on one of the lowered outriggers to lift pine branches over the backhoe controls. After plowing cable into the ground for a short while, the crew took a coffee break. While the crew was on break, appellant stepped around the row of lilac bushes to talk with the owner of the property on which the trees were located.[2] The crew resumed work while Barger talked with the property owner for about five minutes. As he was returning to the work site, he "saw that Randy Hutchison [sic] had stepped with one foot down on the backfill blade, and it looked . . . to [him] that the branch he was trying to lift over the controls was becoming entangled in the levers." Barger immediately "rushed in to try and help him get it over so that he wouldn't get hurt." As Barger was reaching for the branch, it hit the backhoe boom control lever, which caused the boom to swing around and crush his leg against the backfill blade.

After the accident, Richard Hemmingsen, construction manager for Northwestern Bell, formed an investigation committee to determine the cause of the accident. The committee's report noted that "[t]he supervisor and another member of the crew were obviously too close to the machine during the job task." At trial Hemmingsen testified that Barger and Hutchinson were too close to the machine because they were within a fifteen foot semicircle from the center pivot of the backhoe, which had been designated a danger zone by Northwestern Bell. He indicated that no one would have been injured if Barger and his crewman had remained outside the fifteen foot area.[3]

---

position. When the backhoe is in the stowed position, two stabilizing units (also called outriggers) on either side of the backhoe and the backhoe boom and arms are raised and chained to the side of the machine. If the lever controlling the backhoe boom is moved when the boom is chained to the machine while it is being operated, the boom will swing to the side only if the chain breaks. Appellant testified that there is enough force in the swing of the backhoe to break the chain.

2. Barger had been unsuccessful in an earlier attempt to locate the property owner to obtain permission to trim the overhanging pine branches.

3. Additionally, Hemmingsen testified that the accident would not have occurred if Barger's crew had been using a Vermeer machine (instead of a Ditch Witch), which permits deactivation of the backhoe while the trenching or plowing equipment is being used, or if appellee's machine had been equipped with a backhoe control lever locking mechanism. Appellant's expert witness, Dr. Richard Bruce Hopkins, a professional engineer with more than twenty years of experience in design analysis for the John Deere Company, corroborated this testimony. (Barger's subsequent action alleged that the Ditch Witch was defective because it did not provide any means of locking the backhoe control levers into place or of deactivating the backhoe.)

Installation of a lever locking device was recommended by the accident investigation committee. In addition, the committee recommended that Northwestern Bell ask appellee to modify the machine's hydraulic system by installing a control valve to enable the operator to deactivate the backhoe while operating the machine's other equipment. After a meeting between representatives of Northwestern Bell and Charles Machine, during which appellee maintained that installation of a control valve would require a major unwarranted redesign of the hydraulic system and a significant expenditure of funds, Northwestern Bell designed a locking device for the backhoe control levers.

Both Hemmingsen and Barger stated that the fifteen foot radius was the distance of the swing of the extended backhoe arm and noted that this danger zone was originally intended to apply to situations in which someone was in the backhoe operator's seat working the controls and digging with the backhoe. Barger, however, admitted knowing that regardless whether anyone was in this seat, the backhoe boom would move if the control levers were accidentally hit while the machine's hydraulic system was activated. Moreover, Hemmingsen testified that the fifteen foot rule also applied when the backhoe had been unchained and the boom had been moved to the uphill side of a bank to counterbalance the machine's weight while plowing across the bank, even though no one was in the backhoe operator's seat during this procedure. He stated that this information was included in the instructions given to employees of Northwestern Bell Telephone Company and noted that a safety demonstration covering appellee's machine was held the day before the accident and was attended by Barger and his crewmembers.

Hemmingsen concluded his report by stating: "[T]he members of the crew and particularly the supervisor were more concerned with getting the job done than they were for their own safety." This conclusion was based on conversations with Barger's crewmen, which apparently disclosed that Barger had originally intended to take July 2 off, but decided to complete the cable laying project before the Independence Day weekend. Other evidence tended to bolster Hemmingsen's conclusion: Barger's testimony that he told the company's right-of-way buyer that it was possible to lay cable in the area in question, but he preferred not to do so; Barger's decision to proceed with the work when he was unsuccessful in contacting the property owner to obtain permission to trim the trees; Hemmingsen's testimony that although it was the construction foreman's responsibility to determine how to complete a particular project, he was not required to proceed with the work if a dangerous situation existed; Hemmingsen's statement that two acceptable alternative means of laying the cable existed that would not have required the machine to proceed through the overhanging trees;[4] and evidence that the tree branches were tied back with ropes to complete the remaining twenty feet of cable laying work after the accident occurred.[5]

Over appellant's objection, the trial court gave the following instruction on assumption of risk, asserted as an affirmative defense by appellee.

### INSTRUCTION NO. 17

The defendant, Charles Machine Works, Incorporated, also contends that the plaintiff, Michael W. Barger, assumed the risk of injury, if any, by using the Ditch Witch equipment in the manner and by placing . . . himself in the position he did under the circumstances then existing. The plaintiff cannot recover if you find that the defendant has established by a preponderance of the evidence each and all of the following propositions:

No. 1. That a dangerous condition existed;

No. 2. That the dangerous condition was obvious or that the plaintiff knew of the dangerous condition; and

No. 3. That plaintiff voluntarily and unreasonably exposed himself to the danger and was injured thereby.

---

These devices were installed by a local dealer of appellee's machine on all seventeen Ditch Witches owned by the telephone company at a cost of approximately $120.00 per machine.

4. Hemmingsen stated that the project could have been completed by boring the cable into the ground, which he noted "would probably [have been] unlikely because of the distance," or by using a spade.

5. Hemmingsen testified that the accident investigation committee recommended that Northwestern Bell adopt a procedure requiring that overhanging tree limbs that are obstacles to the work be trimmed or tied back with hand lines. He stated, however, that this recommendation was not a company policy at the time of the accident.

In determining whether plaintiff voluntarily and unreasonably assumed a known risk of injury, you should consider all the facts established by the evidence, including the plaintiff's age, experience, knowledge and understanding, as well as the obviousness of the alleged defect and the danger it posed.

In addition, the trial court gave the following "rescue" instruction, which appellant requested after his objection to the assumption of risk instruction was overruled.[6]

### INSTRUCTION NO. 17A

You are instructed that one who sees another in imminent and serious peril, which peril was not caused by the plaintiff's own actions, cannot be charged with assumption of risk, as set out in Instruction No. 17, in risking serious injury in attempting to effect a rescue, provided the attempt is not recklessly or rashly made .... The word 'reckless,' as used in these instructions, means proceeding with a heedless disregard for or indifference to consequences and the rights of persons, including oneself.

On appeal Barger argues that the jury was erroneously instructed on assumption of risk because such an instruction was inappropriate in a rescue situation. He asserts that the moment he saw Hutchinson struggling with the pine branch that became entangled in the backhoe control levers and noticed that his crewman's foot was on the backfill blade, which was within the fifteen foot swing area of the backhoe boom, he rushed in to rescue Hutchinson from the imminent danger of being injured by the swinging boom. Thus, appellant contends that because he rushed to his crewman's aid, he was not conscious of the risk of injury to himself and did not voluntarily assume the danger as a matter of law.[7]

Appellee argues that Barger assumed the risk of injury the moment he instructed Hutchinson to stand on the lowered outrigger because such an instruction demonstrated his deliberate, rational decision to ignore the equipment safety demonstration held the day before the accident. Moreover, appellee asserts that Barger also assumed the risk by going to his crewman's aid because he knew and appreciated the danger before he encountered it.

■■■ Although Iowa law determined the substance of jury instructions in this diversity action, the method of grant or denial of instructions as well as their form was a procedural matter and was thus controlled by federal law. *Wright v. Farmers Co-op*, 620 F.2d 694, 696–97 (8th Cir. 1980). In determining whether the trial court properly submitted an instruction on assumption of risk in the instant case, this court must read the charge as a whole. *Wright v. Farmers Co-op, supra*, 620 F.2d at 697; *Smith v. Wire Rope Corp.*, 383 F.2d 186, 188 (8th Cir. 1967). An erroneous instruction does not require reversal if the error was cured by a subsequent instruction or by consideration of the entire charge. *Wright v. Farmers Co-op, supra*, 620 F.2d at 697; *Smith v. Wire Rope Corp., supra*, 383 F.2d at 188. After considering the instructions in their entirety, however, we conclude that the assumption of risk instruction was erroneous because it was irremediably tainted by the rescue instruction.[8]

6. Although appellant requested this instruction, he objected to inclusion of the words "which peril was not caused by the plaintiff's own actions" during the conference on instructions, arguing that the jury could misinterpret this language. Appellee objected to the instruction in its entirety.

7. Appellant also points to Hemmingsen's testimony to show that he did not make a deliberate decision in advancing to Hutchinson's aid. Hemmingsen stated that as a result of his investigation of the accident, "[i]t was pretty

much [his] feeling that that was done on a reflex-type impulse and probably [Barger] didn't even have time to consider his safety."

8. Although appellant does not raise any specific objection to the rescue instruction on appeal, we note that he did register an objection to some of the language of the instruction during trial. *See* n. 6 *supra*. Furthermore, because we must consider the charge as a whole in determining the propriety of the assumption of risk instruction, we are not constrained to fo-

■ We note initially that Iowa courts do not recognize contributory negligence as a defense to a claim based on strict liability in tort. *See Hawkeye Security Insurance Co. v. Ford Motor Co.,* 199 N.W.2d 373, 380 (Iowa 1972). Assumption of risk, however, is a defense to a strict liability action when the plaintiff has "voluntarily and unreasonably proceed[ed] to encounter a known danger." *Hughes v. Magic Chef, Inc.,* 288 N.W.2d 542, 545 (Iowa 1980), *quoting,* Restatement (Second) of Torts § 402A, Comment n (1965) (brackets in original). Although the Supreme Court of Iowa has acknowledged that an instruction on assumption of risk may be appropriate in a rescue situation, which is presented here, it has cautioned that such an instruction "should be sparingly given." *Knudsen v. Merle Hay Plaza, Inc.,* 160 N.W.2d 279, 284 (Iowa 1968). We are not required to decide broadly the questions whether and in what circumstances an assumption of risk instruction may be given in a rescue situation [9] because we find that the assumption of risk instruction in this case, coupled with the rescue instruction, presented a substantial risk that in reaching its verdict the jury was permitted to consider and did consider evidence of appellant's prior contributory negligence.

■ It is clear that the rescue doctrine, which finds its source in questions of proximate cause and contributory negligence, has traditionally been used to counter an implication of plaintiff's contributory negligence in actions in which this defense is permitted. Under the doctrine, one who is injured in reasonably undertaking to rescue a person in danger may not be charged with contributory negligence and thus may recover from the person whose negligence created the perilous situation. *E. g., Henneman v. McCalla,* 260 Iowa 60, 148 N.W.2d 447, 454 (1967). Hence, the issue presented by the rescue doctrine is whether the injured rescuer's intervention broke the chain of causation from defendant's negligence or constituted contributory negligence that would bar recovery. *See Clayton v. Blair,* 254 Iowa 372, 117 N.W.2d 879, 880–81 (1962).

By stating that "one who sees another in imminent and serious peril, *which peril was not caused by the plaintiff's own actions,*" the rescue instruction in the instant case impermissibly allowed the jury, in deciding whether appellant assumed the risk of injury, to consider what may have been his contributory negligence in disregarding the equipment safety demonstration and instructing his crewman to stand on one of the lowered outriggers on the Ditch Witch. Such an instruction merged the defenses of assumption of risk and contributory negligence. Because Iowa does not recognize a contributory negligence defense to an action based on a products liability theory, *Hawkeye Security Insurance Co. v. Ford Motor Co., supra,* 199 N.W.2d at 380, this result cannot stand.

The conclusion we have reached makes it unnecessary to decide other issues raised on this appeal since on retrial they may not reappear, and, if so, may emerge in different form and record context.

From what has been said, it follows that the judgment of the district court is reversed and the case is remanded for a new trial.

■

cus narrowly on the language of the assumption of risk instruction in reaching our decision.

**9.** Although we do not hold that an assumption of risk instruction may never be given in a rescue situation, we note that a rescue or attempted rescue presents unique facts requiring careful evaluation by the trial court in determining whether the circumstances surrounding the rescue effort warrant the submission of an assumption of risk instruction, and, if so, whether the facts are such indeed as to justify a separate rescue instruction.